UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| AMY HANSEN, an individual,<br><br>Plaintiff,<br><br>v.<br><br>ROSS DRESS FOR LESS, INC., a Virginia corporation,<br><br>Defendant. | Case No. 1:26-cv-00116-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

Before the Court are (1) Plaintiff Amy Hansen's Motion for Declaratory Judgment That the Public-Accommodation Claims (Counts I, II, and III) Are Not Within the Scope of Defendant's Dispute Resolution Agreement (Dkt. 32) and (2) Defendant Ross Dress for Less, Inc.'s Motion to Compel Arbitration and Stay Proceedings (Dkt. 39). Both motions ask the Court to determine whether Hansen's three public-accommodation claims are within the scope of the parties' Dispute Resolution Agreement. Hansen does not dispute that her remaining ten claims, which arise from her employment, fall within the agreement and must be arbitrated. For the reasons set forth below, the Court finds that all of Hansen's claims are subject to arbitration. The Court will therefore deny Hansen's motion, grant Ross's motion, and stay this action pending arbitration.

## BACKGROUND

Defendant Ross operates a chain of discount department stores. *Stock Decl.* ¶ 2, Dkt. 38-1. In April 2024, Ross hired Plaintiff Amy Hansen to work as a cashier at its store in Meridian, Idaho. *Id.* ¶ 1. When she was hired, Hansen electronically signed multiple documents, including a Dispute Resolution Agreement requiring that all "Covered Disputes" between her and Ross be resolved "through arbitration rather than in court." *Agreement*, Dkt. 38-2 at 3. Under the agreement, "Covered Disputes" include "any and all" disputes "arising out of or in any way related to [Hansen's] employment with Ross[.]" *Id.* § A.

Not long after Hansen began working for Ross, she disclosed to her manager, Stella Shabaz, that she had been diagnosed with schizoaffective disorder and bipolar disorder but that she effectively managed her conditions with medication. *Compl.* ¶ 11, Dkt. 1. Hansen says she disclosed this information to Shabaz because she had been taunted by Shabaz and other employees. *Id.* According to Hansen, within 24 hours of disclosing her mental health disabilities to Shabaz, Ross placed her on unpaid administrative leave pending an investigation. *Id.* ¶ 13. Ross did not explain the basis for the investigation and told Hansen only that Human Resources would contact her. *Id.*

A few days later, on June 3, 2024, a Ross agent interviewed Hansen and questioned her about her schizoaffective disorder, including whether she had ever been institutionalized, whether she still heard voices, whether she had thoughts of hurting others, and whether she would hurt anyone at the store. *Id.* ¶ 14. Hansen found the questions inappropriate, intrusive, and prejudicial, and she believed they were intended

solely to confirm Ross's belief that she "posed a violent threat." *Id.* ¶ 15. According to Hansen, her "disability disclosure triggered an immediate presumption of violence and an investigation that ignored her years of stability and successful employment." *Id.*

At the conclusion of its investigation, Ross determined that Hansen's conduct violated Ross's Workplace Anti-Violence Policy, and it terminated her employment. *Id.* ¶ 16; *see also Briant Decl.* ¶¶ 1, 3, Dkt. 38-3; *June 7, 2024 Email re Amy [Hansen]*[1] *– Separation Talking Points and Involuntary Separation Form*, Dkt. 38-4 at 1. Hansen also alleges that Ross banned her from shopping as a customer at any Ross store nationwide. *Compl.* ¶¶ 17-18, Dkt. 1. Hansen then sued Ross in the United States District Court for the Northern District of California, asserting thirteen causes of action. *Id.* ¶¶ 19-147.

Of her thirteen claims, Hansen concedes that ten arise from her employment, including her disability discrimination, failure-to-accommodate, and interactive process claims under the California Fair Employment and Housing Act ("FEHA") and the Idaho Human Rights Act ("IHRA"), as well as her wage claims. But she contends that the remaining three arise from the customer ban rather than her employment. Those claims are (1) violation of the Unruh Civil Rights Act; (2) discrimination in business dealings in violation of California Civil Code section 51.5; and (3) disability discrimination in violation of Title III of the Americans with Disabilities Act.

After the Northern District of California transferred the case to this Court, Hansen moved for a declaration that these three "public-accommodation" claims fall outside the

[1] At the time of her termination, Amy Hansen was known by her maiden name, Amy Simpson.

parties' arbitration agreement. Dkt. 19; Dkt. 32. Ross responds that these claims "touch matters" covered by the agreement and therefore must be arbitrated alongside the other ten. Ross, in turn, moves to compel arbitration of all of Hansen's claims and to stay this action. Dkt. 39.

## ANALYSIS

### A. Scope of the Arbitration Agreement

The Federal Arbitration Act ("FAA") governs the interpretation and enforcement of the parties' arbitration agreement. *Agreement* § D, Ex. A to *Stock Decl.*, Dkt. 38-2 at 4. The FAA reflects both a "liberal federal policy favoring arbitration, and the fundamental principle that arbitration is a matter of contract." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (citations and quotation marks omitted). "The standard for demonstrating arbitrability is not high." *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 719 (9th Cir. 1999). As the Supreme Court has made clear, the FAA "leaves no place" for a district court to exercise its discretion and instead mandates that the court direct the parties to arbitrate issues covered by a signed arbitration agreement. *Id.* (citing *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985)). Such agreements must be "rigorously enforced." *Id.* (citing *Dean Witter Reynolds*, 470 U.S. at 221).

When considering whether to compel arbitration, the Court determines only (1) whether a valid arbitration agreement exists, and, if so, (2) whether the arbitration agreement encompasses the dispute at issue. *Cox v. Ocean View Hotel Corp.*, 533 F.3d 1114, 1119 (9th Cir. 2008). If both conditions are met, the Court must compel arbitration. 9 U.S.C. § 4; *Dean Witter Reynolds*, 470 U.S. at 218.

Hansen does not contest the validity of the parties' arbitration agreement. Thus, the sole question here is whether the agreement encompasses Hansen's public-accommodation claims.[2] In answering this question, the Court looks to both the content of the arbitration clause and the nature of the dispute. *Jackson v. Amazon.com, Inc.*, 65 F.4th 1093, 1104 (9th Cir. 2023). "To be arbitrable, the dispute must relate to the contract." *Id.* The Court must examine the factual allegations underlying the claims and determine whether they fall within the scope of the arbitration clause. *Id.* If the agreement contains a broad arbitration clause, the factual allegations need only "touch matters" covered by the clause. *Id.* Doubts concerning the scope of arbitrable issues "are to be resolved in favor of arbitrability." *Simula*, 175 F.3d at 721.

With these principles in mind, the Court turns first to the text of the parties' arbitration agreement. As noted above, the agreement covers claims "arising out of or in any way related to" Hansen's employment. *Agreement § A*, Dkt. 38-2 at 3. Such language is "broad and capable of expansive reach," but it is not "boundless." *United States ex rel. Welch v. My Left Foot Children's Therapy, LLC*, 871 F.3d 791, 798 (9th Cir. 2017). As the Ninth Circuit has explained, "the phrases, 'arising out of' and 'related to,' mark a boundary by indicating some direct relationship." *Id.* A claim does not "arise out of" or "relate to" the plaintiff's employment simply because it involves the employer or an incident that occurred while the plaintiff was employed. *Id.*

---

[2] The parties agree that the Court, rather than an arbitrator, must decide that question. *See Agreement* § E, Dkt. 38-2 at 4; *Def.'s Br.* at 8 n.3, Dkt. 39-1.

In *Welch*, the plaintiff alleged that her former employer violated the False Claims Act by submitting fraudulent Medicaid claims. The Ninth Circuit held that those claims did not "arise out of" or "relate to" her employment, even though she observed the alleged fraud while she was employed. *Id.* The court explained that the plaintiff could have discovered the factual basis for her claims in a different capacity, that the defendants could have engaged in the same fraudulent conduct absent any relationship with her, and that the legal basis for her claims would have existed regardless of where she worked. *Id.* at 799. It reasoned that her claims therefore arose from the employer's "act of fraudulent billing" rather than from her employment, and they had nothing to do with her conduct as an employee. *Id.*

The same cannot be said of Hansen's public-accommodation claims, which have everything to do with her employment. Ross has submitted evidence that it asked Hansen not to visit its stores at the same time, and for the same reason, that it fired her—because it found she had violated its Workplace Anti-Violence Policy. *Briant Decl.* ¶ 4, Dkt. 38-3; *Email re Amy [Hansen] – Separation Talking Points and Involuntary Separation Form*, Dkt. 38-4 at 1. When Ross fires an employee for violating that policy, it gives the store manager standard "separation talking points," which include an instruction asking the employee not to visit Ross stores. *Briant Decl.* ¶ 4, Dkt. 38-3. Hansen's store manager confirmed that she delivered these talking points when she told Hansen she was fired. *June 8, 2024 Email Chain*, Dkt. 38-4 at 5. At least according to Ross, it would not have asked Hansen to refrain from visiting its premises not to visit its stores—what Hansen understood as a "ban"—had it not found that she violated its Workplace Anti-

Violence Policy. *Id.*, Dkt. 38-4 at 1 ("Use only with separations involving workplace violence and/or threats").

More importantly, Hansen's own allegations confirm that her public-accommodation claims are rooted in her employment relationship. Hansen herself says that Ross told her she was "banned as a customer from all Ross stores" at the same time it told her she was fired. *Hansen Decl.* ¶ 8, Dkt. 15-1. And she specifically alleges that Ross, acting out of "fear and bias" and "driven by stereotypes about mental illness," perceived her as a threat, terminated her employment, *and* banned her as a customer because of the mental health disabilities she disclosed to her manager while working at Ross. *Compl.* ¶¶ 17-18, Dkt. 1. All thirteen of Hansen's claims, including her public-accommodation claims, stem from these same allegations, and resolving any of them will require the factfinder to examine Ross's employment policies and Hansen's workplace conduct. *See Simula*, 175 F.3d at 722–25 (finding all of the plaintiff's claims arbitrable because resolving each would require interpreting the agreement governing the parties' relationship).

Hansen nonetheless insists that her public-accommodation claims arise from her status as a customer, not as an employee. In her view, these claims rest on duties Ross owes to every member of the public who shops in its stores, and she posits that any shopper Ross excluded because of a disability could bring the same public-accommodation claims even if that shopper had never worked for Ross. That may be true in the abstract, but as Ross notes, "Hansen is not a hypothetical shopper with no employment relationship." *Def.'s Reply* at 6, Dkt. 42. Unlike the "hypothetical

shopper"—or even a hypothetical former employee who shops at Ross—Hansen does not allege that she was "*later* injured by [Ross] merchandise, denied a refund, or excluded from a store" for reasons independent of her employment. *See Pl.'s Opp'n* at 2, Dkt. 41 (emphasis added). Rather, by her own account, Ross "banned" her from all Ross stores for the same reason it fired her—because it improperly perceived her disclosure of her mental health disabilities as a workplace threat.

This admission distinguishes this case from *Welch*, where the employer "could have engaged in" the same conduct "even in the absence of any contractual or employment relationship" with the plaintiff and a third party "could have brought the[] same claims . . . based on virtually the same alleged facts." *Welch*, 871 F.3d at 799 (quoting *Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204, 1219-20 (11th Cir. 2011)). Ross could not have banned a customer who never worked for it on the ground that she made workplace threats in violation of its Workplace Anti-Violence Policy. Here, all the alleged facts supporting Hansen's public-accommodation claims occurred as part and parcel of her employment and are inextricably intertwined with her claims that she concedes must be arbitrated. *See Jackson*, 65 F.4th at 1101 (explaining that the question is "whether the factual allegations underlying [the claims] are within the scope of the arbitration clause, whatever the legal labels attached to those allegations" (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 622 n.9 (1985))).

*Jackson*, on which Hansen relies to argue that her employment at most explains Ross's motive for the ban, does not suggest a different result. There, the Ninth Circuit

rejected the argument that the drivers' claims were arbitrable because Amazon would not have monitored them had they not been drivers. 65 F.4th at 1103. That argument, the court explained, "confuse[d] the motivation for Amazon's alleged misconduct with the nature of Jackson's claims," because "[n]either Amazon's motive nor the violation of any provision of this contract would be an element of any of Jackson's claims." *Id.* Here, by contrast, motive is central to Hansen's public-accommodation claims. As pleaded, each requires her to prove that Ross excluded her from its stores because of her disability. *See Compl.* ¶¶ 19-43, Dkt. 1; *Def.'s Br.* at 16, Dkt. 39-1. Resolving those claims will therefore require the factfinder to decide why Ross acted—because of Hansen's disability, as she alleges, or because Ross concluded after a workplace investigation that she had violated its Workplace Anti-Violence Policy. That is the same question at the center of her employment claims, as Hansen has acknowledged. *See* Dkt. 15 at 21 (stating that her employment claims "require adjudication of the same discriminatory animus alleged in the first three causes of action"). Hansen's public-accommodation claims thus cannot be resolved without reference to her employment.

Hansen's reliance on *Oliver v. Nordstrom King of Prussia*, No. CIV.A.10-5340, 2010 WL 5121966 (E.D. Pa. Dec. 14, 2010), is misplaced for similar reasons. There, Nordstrom fired the plaintiff and later, after she had taken a job with a cosmetics company, refused to let her enter its store to work an event for her new employer. *Id.* at *1–2, *5. The court declined to compel arbitration of her claim for intentional interference with that new employment relationship because "[a]ll of the alleged facts supporting" the claim "occurred while she was no longer employed by Nordstrom," and

those facts were not "intertwined with" the claims that had to be arbitrated. *Id.* at *5–6. Neither is true here. Ross banned Hansen from its stores in the same call, and as part of the same separation, in which it fired her. And, as explained above, her challenge to that instruction turns on the same question of motive as her employment claims. Her employment with Ross is therefore more than "historical background" to her public-accommodation claims. *Cf. Jackson*, 65 F.4th at 1102 (quoting *Howard v. Goldbloom*, 30 Cal. App. 5th 659, 669, 241 Cal. Rptr. 3d 743, 751 (2018)).

In sum, the parties' arbitration agreement is valid and enforceable, and it covers all of Hansen's claims. The Court will therefore compel arbitration of each of them. When a district court compels arbitration and a party requests a stay pending arbitration, FAA § 3 "compels the court to stay the proceeding," and the court "does not have discretion to dismiss the suit on the basis that all the claims are subject to arbitration." *Smith v. Spizzirri*, 601 U.S. 472, 475, 479 (2024). Accordingly, the Court will stay the entire action pending completion of arbitration.

## ORDER

**IT IS ORDERED that:**

1. Plaintiff's Motion for Declaratory Judgment (Dkt. 32) is **DENIED**.

2. Defendant's Motion to Compel Arbitration and Stay Proceedings (Dkt. 39) is **GRANTED**.

3. Plaintiff shall arbitrate all claims asserted in this action in accordance with the parties' Dispute Resolution Agreement.

4. This action is **STAYED** pending completion of arbitration.

5. The parties shall file a joint status report within 14 days after the arbitration concludes.

DATED: November 23, 2026

B. Lynn Winmill
U.S. District Court Judge